DEFENDERS OF WILDLIFE, Natural Resources Defense Council, Sierra Club, Humane Society of the United States, Center for Biological Diversity, Jackson Hole Conservation Alliance, Friends of the Clearwater, Alliance for the Wild Rockies, Oregon Wild, Cascadia Wildlands, Western Watersheds Project, Wildlands Network, and Hells Canyon Preservation Council, Plaintiffs,

v.

Ken SALAZAR, Secretary of the Interior, Rowan Gould, Acting U.S. Fish and Wildlife Service Director, and United States Fish and Wildlife Service, Defendants.

Greater Yellowstone Coalition, Plaintiff,

v.

Ken Salazar, Secretary of the Interior, Rowan Gould, Acting U.S. Fish and Wildlife Service Director, and United States Fish and Wildlife Service, Defendants.

Nos. CV 09–77–M–DWM,
CV 09–82–M–DWM.

United States District Court,
D. Montana,
Missoula Division.

Sept. 8, 2009.

**1206**

Douglas L. Honnold, Jenny K. Harbine, Timothy J. Preso, Earthjustice Legal Defense Fund, Brian K. Gallik, Goetz, Gallik & Baldwin, Bozeman, MT, Deborah A. Sivas, Robb W. Kapla, Environmental Law Clinic, Mills Legal Clinic at Stanford Law School, Stanford, CA, for Plaintiffs.

Michael Richard Eitel, U.S. Department of Justice, Denver, CO, Victoria L. Francis, Office of the U.S. Attorney, Billings, MT, for Defendants.

## ORDER

DONALD W. MOLLOY, Chief Judge.

### I. Introduction

This Order is not a final determination of any issue in the case. The Order only addresses the propriety of granting the extraordinary relief of a preliminary injunction. *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008). Nor is the Order a complete analysis of the complex legal questions the parties raise. Because the absence of a ruling hangs like the Sword of Damocles, I am issuing this Order which will be followed by a fully reasoned decision on the Plaintiffs' motion for a preliminary injunction.

Plaintiffs challenge the U.S. Fish & Wildlife Service's 2009 decision to designate and delist the northern Rocky Mountain gray wolf distinct population segment (DPS) under the Endangered Species Act ("ESA"), 16 U.S.C. § 1536.

Before the Court is Plaintiffs' motion for a preliminary injunction. Plaintiffs ask the Court to prevent scheduled wolf hunts, one which began September 1, 2009, in Idaho and the second set to begin September 15, 2009, in Montana. In support of their motion, Plaintiffs argue (1) the Fish & Wildlife Service's delisting of only the Idaho and Montana portion of the northern Rockies distinct population segment—excluding wolves in Wyoming—violates the Endangered Species Act (ESA); (2) the Service's determination that "unoccupied" habitat was not significant to the species' conservation was arbitrary and capricious; and (3) the Service's determination that wolves are not threatened by a foreseeable lack of genetic exchange was arbitrary and capricious.

Defenders of Wildlife seek a preliminary injunction, claiming that if the hunts proceed irreparable harm will occur to (1)

individual wolves that are killed, (2) the population as a whole due to the loss of potential dispersers between subpopulations, and (3) plaintiff members through a loss of opportunity to see and hear wolves in the wild. Because there is insufficient proof of irreparable harm to the wolf population, as opposed to individual wolves, the request for a preliminary injunction is denied.

## II.  Preliminary Injunction Standard

■  Before the Court may grant a preliminary injunction, plaintiffs must establish (1) that they are "likely to succeed on the merits," (2) that they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) that the "balance of equities tips" in their favor, and (4) that such an injunction is in the "public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008).

Plaintiffs argue that the *Winter* preliminary injunction standard does not apply to ESA cases as *Winter* only spoke to preliminary injunctions involving the National Environmental Policy Act. This argument is unpersuasive. First, the proposition ignores the broad language of *Winter*. *See, e.g.*, 129 S.Ct. at 376 ("A preliminary injunction is an extraordinary remedy never awarded as of right."); at 374 ("A plaintiff seeking a preliminary injunction must establish . . . ."). Nowhere does the Supreme Court suggest that the holding of *Winter* is inapplicable to ESA cases. Second, the Ninth Circuit has already interpreted *Winter* to replace Ninth Circuit decisions that included a differing preliminary injunction standard. *American Trucking Ass'n v. City of Los Angeles*, 559 F.3d 1046 1052 (9th Cir.2009).

Plaintiffs point to *TVA v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), as the controlling case setting the preliminary injunction standard that applies in ESA cases. Pl. Reply at 22. While *Hill* does hold that courts shall defer to Congress when it has decided priorities in a given area, and that Congress has done so with the ESA, this is not the promulgation of a unique preliminary injunction standard. *Hill*, 437 U.S. at 194, 98 S.Ct. 2279. Instead, *Hill* affects how the Court balances the equities in the third and fourth part of the preliminary injunction standard laid out in *Winter*, but it does not command a separate ESA standard when measured by the Court's ruling in *Winter*.

## III.  Analysis [1]

### A.  Plaintiffs' Probability of Success on the Merits

■  Plaintiffs argue that the delisting part of the distinct population segment (DPS) is legally invalid as the Endangered Species Act (ESA) does not allow for listing distinctions below that of a subspecies or DPS. The position suggests that the agency's decision reflects a political rather than a scientific determination. The argument states that the Service can only list or delist the entire DPS, but to include or exclude a part of the DPS is an arbitrary determination. The thrust of the Plaintiffs' argument is that the ESA only allows for the listing and delisting of "species," defined as the species, any subspecies and a designated DPS—not portions of the identified species. 16 U.S.C. § 1532(16). While Plaintiffs acknowledge that elsewhere in the ESA the Secretary is required to publish in the Federal Register "over what portion of its range [a species] is endangered," *id.* § 1533(c)(1), Plaintiffs

---

1. While Plaintiffs assert three separate grounds upon which they argue Court should invalidate the Service's 2009 delisting of wolves in Idaho and Montana (*see supra* Part I), this Order only addresses delisting part of a DPS since the conclusion finds a likelihood of success on that cause.

contend that this does not grant authority to geographically constrain the ESA's reach. Pl. Br. at 9.

Defendants on the other hand take the position that the ESA is ambiguous as to whether protections must be applied to the entire listed species or whether they may be applied only within a significant portion of the species' range, and that the Service's interpretation is reasonable and should receive *Chevron* deference. The argument is one of statutory interpretation. Defendants argue that the ability of the Secretary to publish and identify the portion of the range that serves an endangered species allows the Service to protect the species within that significant portion of its range. Defs. Opp'n at 13–15.

The claim that the ESA is ambiguous about the scope of where protections can be applied appears wrong. The ESA specifically states in the definition of species that a " 'species' includes any subspecies . . . and any distinct population segment of any species." 16 U.S.C. § 1532(16). The Service determined that the wolves in the northern Rockies are a distinct population segment. 74 Fed.Reg. at 15,129. Having done so, the Service cannot delist part of the species below the level of the DPS without running afoul of the clear language of the ESA. Though the record here is incomplete, the earlier delisting case gives rise to an inference that the laudable efforts of the Fish and Wildlife Service resulted in a practical determination that does not seem to be scientifically based.

Comparing the definition of species in the ESA to the ability of the Secretary to publish the species' range of endangerment appears to produce ambiguity in the statutory language if looked at in a vacuum. But the history and context behind the DPS belie such a claim. The statutory definition of the term "distinct population segment" was added to the ESA in 1978. H.R. Conf. Rep. No. 95–1804, at 17 (1978).

In adopting the term DPS, Congress stated that "there may be instances in which [the Service] should provide for different levels of protection for populations of the same species." S.Rep. No. 96–151. The Ninth Circuit has articulated this purpose behind the DPS clarification many times. *See, e.g., Trout Unlimited v. Lohn,* 559 F.3d 946, 949 (9th Cir.2009). The language of the statute and the purpose behind the DPS amendment are superfluous if the Secretary already has the flexibility to limit the protections of the ESA through its authority to publish the range of the species. *Alsea Valley Alliance v. Evans,* 161 F.Supp.2d 1154, 1162 (D.Or. 2001), *appeal dismissed for lack of jurisdiction,* 358 F.3d 1181 (9th Cir.2004).

Assuming the statute is ambiguous, the Service's current interpretation regarding its ability to delist below the level of a DPS would receive little deference. In *Chevron U.S.A. v. Natural Resources Defense Council,* the Supreme Court requires courts to defer to "reasonable" constructions of a statute put forth by an agency. 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Such deference does not apply when an "agency interpretation of a relevant provision" conflicts with the "agency's earlier interpretation." *I.N.S. v. Cardoza–Fonseca,* 480 U.S. 421, 447 n. 30, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). Here, the Service has notably taken the past position that DPS boundaries cannot be subdivided. *See, e.g.,* 68 Fed. Reg. 15804, 15825 (Apr. 1, 2003) ("Delisting can occur only when a species (or subspecies or DPS) is recovered . . . ."). The change of statutory interpretation in the 2009 delisting merits little deference. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,* 524 F.3d 917, 928 (9th Cir. 2008).

Defendants urge that the Supreme Court rejected such a position in *FCC v. Fox Television Stations,* 556 U.S. 502, 129

S.Ct. 1800, 1810, 173 L.Ed.2d 738 (2009) ("We find no basis in the [APA] or in our opinions for a requirement that all agency change be subjected to more searching review."). That case, however, involved a change in enforcement policy, and not a change in statutory interpretation. Tellingly, the Supreme Court did not cite *I.N.S. v. Cardoza–Fonseca*, 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987), the case that limits deference for inconsistent statutory interpretations by an agency. What distinguishes *Cardoza–Fonseca* from *Fox* is the difference between a policy change, which acknowledges that politics impact agency action, and statutory interpretation, which presumes the law does not change simply because an administration does. As such, the Service's claim that its latest proclamation on DPSs should receive deference is not well taken.

Finally, even if the Service was permitted to delist only a part of a DPS like it has done here, it cannot do so in an arbitrary and capricious manner. The Service has distinguished a natural population of wolves based on a political line, not the best available science. That, by definition, seems arbitrary and capricious.

The Plaintiffs, at this early stage, have demonstrated a likelihood of success on the merits.

## B. Likelihood of Irreparable Harm

■ This prong of the *Winters* test is not satisfied on the current record. Plaintiffs argue that if the wolf hunt occurs as planned that irreparable harm exists through the deaths of individual wolves, through harm to the overall DPS population, and through the inability of members of the Plaintiffs to see wolves in the wild.

Defendants argue that irreparable harm does not occur with the taking of a single wolf. Def. Opp'n at 6. They acknowledge harm to the wolf but deny harm to the wolf population that might stem from a one- or two-year hunting harvest. The low threshold for irreparable harm advanced by the Plaintiffs is not supported by either the ESA or the case law interpreting the Act.[2]

■ First, to consider any taking of a listed species as irreparable harm would produce an irrational result. The ESA permits incidental takes of a listed species. *See* 16 U.S.C. § 1536(b)(4). If the death of a single wolf constituted irreparable harm, no species could be taken before it is delisted. Such a proposition would render the operative provisions of other environmental laws useless. Courts are not required to issue a preliminary injunction for every violation of the law. *National Wild-*

**2.** Plaintiffs rely primarily on two citations to support their argument that the taking of a single member of a protected species constitutes irreparable harm. The first is an unreasoned Ninth Circuit order in which the court makes the conclusory determination that "the lethal taking of the California sea lions is, by definition, irreparable." *Humane Society of the United States v. Gutierrez*, 523 F.3d 990, 991 (9th Cir.2008). The quoted statement is clearly not meant to establish a rule applicable to different species and circumstances, as the same order finds the taking of a small percentage of a protected fish population unobjectionable. *Id.* In *National Wildlife Federation v. Burlington Northern Railroad, Inc.*, the court affirmed the denial of injunctive relief based on the absence of evidence of future deaths of members of a protected species, in that case grizzly bears. 23 F.3d 1508, 1512 (9th Cir.1994). This is not tantamount to a statement that the death of a single grizzly would constitute irreparable harm. In fact, the court clarified that the standard for an ESA injunction is the showing of a definitive threat of future harm to the "protected species." *Id.* at 1512 n. 8. Moreover, there are important distinctions between protected wolf and grizzly bear populations that must be accounted for before judgments regarding irreparable harm with respect to one may be cited as precedent in matters relating to the other.

*life Federation v. Burlington Northern Railroad, Inc.*, 23 F.3d 1508, 1511 (9th Cir.1994).

■ Second, courts have found that the death of a small number of individuals may constitute irreparable harm, but this situation exists when the "loss of those individuals would be significant for the species as a whole." *Pacific Coast Fed'n of Fisherman's Ass'ns v. Gutierrez*, 606 F.Supp.2d 1195, 1210 n. 12 (E.D.Cal.2008). There is no proof to support this assertion in this record. Indeed all of the proof submitted by expert affidavit is to the contrary. Thus, irreparable injury requires harm "significant" to the "overall population." *Id.* at 1210. Such a conclusion on what constitutes irreparable harm is persuasive for at least two reasons. First, in addressing what constitutes irreparable harm, the purpose of a preliminary injunction should be taken into account. The preliminary injunction is designed to preserve the Court's power to render a meaningful decision. *Penn v. San Juan Hospital, Inc.*, 528 F.2d 1181, 1185 (10th Cir.1975). As such, it makes no sense to grant a preliminary injunction for the death of a single listed animal when the Court could still offer a meaningful decision even if no preliminary injunction is granted. Second, the purpose of the ESA is to prevent species "endangerment and extinction." *Trout Unlimited*, 559 F.3d at 949. With this purpose in mind, the measure of irreparable harm is taken in relation to the health of the overall species rather than individual members.

The Plaintiffs fail to offer evidence that the DPS will suffer irreparable harm if the Idaho and Montana wolf hunting seasons occur in 2009—even assuming hunters manage to kill 330 wolves.[3] In the absence of scientific proof, Plaintiffs contend the hunts will disrupt travel between the core recovery areas and reduce the chance for genetic exchange to occur. Pl. Br. at 31. On the other hand, Defendants provide affidavits from scientific experts that a wolf population such as the northern Rocky Mountain DPS can sustain single season harvest rates in excess of 30%. Mech ¶¶ 24–25; Hebblewhite ¶ 10. The wolf hunts here, even if they reach the maximum take in both states, would mean taking about 20% of the wolf population, well below what scientists believe the population can easily withstand through a one- or two-year hunt. The conservative estimate in the record for the northern Rocky Mountain's growth rate of 22% is in excess of the two states' planned kills of 21% of the DPS. Mech ¶ 27. In addition, the hunt is not expected to have any impact on the genetic connectivity of the DPS. Smith Affidavit.

The Defendants have offered scientific evidence that no irreparable harm will occur if the 2009 wolf hunts occur in Idaho and Montana. Plaintiffs have failed to offer any contrary evidence. As such, assuming that the taking of a single animal is not the standard, there is no basis to find irreparable harm that would justify a preliminary injunction in this case.

## C. Balance of Equities and Public Interest

Without showing irreparable harm, the Plaintiffs have failed to meet their burden for issuing a preliminary injunction. Even so, the Plaintiffs are likely to be able to meet their burden to show the balance of equities tip in their favor. They would also likely prevail in showing an injunction is in the public interest.

---

**3.** Wolf hunts that do not allow aerial hunting, poisoning or baiting, such as those planned for Montana and Idaho, are normally considered ineffective at reducing wolf populations. Hebblewhite ¶ 15.

As briefly discussed above, *TVA v. Hill* holds that Congress has made it clear that in taking measure of the balance of interests, endangered species, here the wolf, claim the highest priority. *Hill*, 437 U.S. at 194, 98 S.Ct. 2279. Congress has already balanced the equities to weigh in favor of the wolf population in its recovery. The public interest in fidelity to the law, and to the intent of Congress to recover the species tips in favor of remand in this case, but fails to justify preliminary injunction relief because irreparable harm to the population of wolves in the DPS is not established on this record. Since the Plaintiffs have failed to show a likelihood of irreparable harm, and *Hill* counsels that equitable considerations such as balancing the equities and the public interest be found in favor of the Plaintiffs in such a case, it is not necessary to provide in-depth analysis of these factors at this time.

### IV. Order

Because Plaintiffs have failed to show a likelihood of irreparable harm to the wolf population, the request for a preliminary injunction must be denied.

Accordingly, IT IS HEREBY ORDERED that the Plaintiffs' motion for preliminary injunction (Doc. No. 58) is DENIED. A separate order will follow to establish a dispositive briefing schedule and set a hearing on the merits.