**ALSEA VALLEY ALLIANCE, and Mark Sehl, Plaintiffs,**

v.

**Donald L. EVANS, Secretary of the United States Department of Commerce; National Marine Fisheries Service; Penelope Dalton, NMFS Director; and William Stelle, NMFS Regional Director for the Northwest Region, Defendants.**

**No. 99–6265–HO.**

United States District Court, D. Oregon.

Sept. 10, 2001.

Robin L. Rivett, Timothy Harris, Anne M. Hayes, Russell C. Brooks, Bellevue, WA, John M. Groen, Groen, Stephens & Klinge, Bellevue, WA, for plaintiffs.

Michael A. Gheleta, Department of Justice, Environment & Natural Resources Div., Sacramento, CA, Jean E. Williams, U.S. Dept. of Justice, Environment & Natural Resources Div., Washington, DC, Samuel D. Rauch, III, U.S. Department of Justice, Wildlife & Marine Resources Section, Washington, DC, for defendants.

## ORDER

HOGAN, District Judge.

On August 10, 1998, the National Marine Fisheries Services ("NMFS") published its final rule listing the Oregon Coast Evolutionary Significant Unit ("ESU") coho salmon as "threatened" pursuant to the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531, *et seq.* Plaintiffs bring this action challenging the validity of the listing decision. Currently before the court are plaintiffs' motion (# 74) for summary judgment and defendants' cross motion (# 81) for summary judgment.

### I. *Background*

In 1973, Congress enacted the ESA "to provide a program for the conservation of ... endangered and threatened species." 16 U.S.C. § 1531(b). The purposes of the ESA are "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species, and to take such

steps as may be appropriate to achieve [these] purposes . . . ." *Id.* § 2(b).

The ESA also recognizes that conservation of listed species may be facilitated by artificial means. Specifically, the ESA defined the term "conservation" as:

> . . . the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary. Such methods and procedures include, but are not limited to, all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation . . . .

16 U.S.C. § 1532(3).

In addition, "if a species is listed under the ESA, the Secretary must not merely avoid elimination of that species, but is required to bring the species back from the brink sufficiently to obviate the need for protected status." *Federation of Fly Fishers v. Daley,* 131 F.Supp.2d 1158, 1163 (N.D.Cal.2000).

Section 4(a) of the ESA commits to the Secretary of Commerce ("Secretary") the responsibility of determining whether certain species are "endangered" or "threatened." The Secretary has delegated this authority to the NMFS.

An "endangered species" is defined as "any species which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A "threatened species" is defined as "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).

When determining whether a species is "endangered" or "threatened," the NMFS must consider five statutorily prescribed factors: 1) "the present or threatened destruction . . . of its habitat"; 2) the "over-utilization" of the species by humans; 3)disease or predation pressures; 4) "the inadequacy of existing regulatory mechanisms"; and 5) "other natural or manmade factors affecting" the continued existence of the species. 16 U.S.C. § 1533(a). This determination is to be made "solely on the basis of the best scientific and commercial data available to [the Secretary]." 16 U.S.C. § 1533(b)(1)(A).

The ESA defines "species" to include "any subspecies of fish or wildlife or plants, and any *distinct population segment* of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16) (emphasis added). Congress did not define the term "distinct population segment" ("DPS") and the ESA does not set forth any restrictive criteria for defining a DPS. *See Southwest Center for Biological Diversity v. Babbitt,* 980 F.Supp. 1080, 1083 (D.Ariz.1997).

Beginning in 1991, NMFS issued various policies that interpreted the ESA and its DPS provision, relevant to the Pacific salmon. NMFS eventually applied these policies to the coho salmon in its August 10, 1998, listing decision.

On November 20, 1991, NMFS issued its "Policy on Applying the Definition of Species Under the Endangered Species Act to Pacific Salmon" (hereinafter the "ESU Policy"). 56 Fed.Reg. 58,612 (1991). In the ESU Policy, NMFS introduced the term "evolutionary significant unit" ("ESU") to interpret the ESA's meaning of "distinct population segment." 56 Fed. Reg. at 58,613 (Nov. 20, 1991). NMFS explained:

> a stock of Pacific salmon will be considered a distinct population, and hence a "species" under the ESA, if it represents an Evolutionary significant unit (ESU) of the biological species. A stock must satisfy two criteria to be considered an ESU:

(1) It must be substantially reproductively isolated from other conspecific population units; and

(2) It must represent an important component in the evolutionary legacy of the species.

56 Fed.Reg. at 58,618.

NMFS states that the first criterion can be measured "by movements of tagged fish, recolonization rates of other populations, measurements of genetic differences between populations, and evaluations of the efficacy of natural barriers." *Id.*

The second criterion is concerned with the "ecological/genetic diversity" of the species as a whole. *Id.* NMFS states that the following questions are relevant in determining whether this criterion is met 1) is the population genetically distinct from other conspecific populations, 2) does the population occupy unusual or distinctive habitat, 3) does the population show evidence of unusual or distinctive adaptation to its environment. *Id.*

On April 5, 1993, the NMFS published its policy entitled "Interim Policy on Artificial Propagation of Pacific Salmon Under the Endangered Species Act" (the "Hatchery Policy"). 58 Fed.Reg. 17,573 (1993). The Hatchery Policy describes how the NMFS considers hatchery populations when making listing decisions about the Pacific salmon. The Hatchery Policy interprets the ESA as requiring NMFS to focus its recovery efforts on "natural populations." The Hatchery Policy builds upon this cornerstone interpretation with the

position that "artificial propagation *may* represent a potential method to conserve listed salmon species when the artificially propagated fish are determined similar to the listed natural population in genetic, phenotypic, and life-history traits, and in habitat use characteristics." 58 Fed.Reg. at 17,573–74 (April 5, 1993) (emphasis added). Although hatchery populations may be included as part of a listed species, NMFS policy is that it should be done sparingly because artificial propagation could pose risks to natural populations.[1] *Id.* at 17,575. Thus, the Hatchery Policy states:

[I]f available information indicates that existing hatchery fish can be considered part of the biological ESU, a decision must be made whether to include them as part of the listed species. *In general, such fish will not be included as part of the listed species.* An exception may be made for existing hatchery fish if they are considered to be essential for recovery.

*Id.* at 17,575 (emphasis added).

NMFS excludes hatchery populations from its listing decision unless the hatchery population can be considered part of the ESU and the NMFS considers the hatchery population "essential to recovery." *Id.* at 17,575.[2] Although the phrase "essential to recovery" is not specifically defined, NMFS gives the examples of a natural population facing a "high, short-term risk of extinction, or if the hatchery population is believed to contain a substan-

---

1. The Hatchery Policy defines "risks" to natural populations in terms of genetics, such as the loss of genetic diversity that could lead to greater instances of disease and/or the inability of natural populations to survive relative to hatchery populations. 58 Fed.Reg. 17,574.

2. NMFS Policy states that a hatchery population will not be considered part of the ESU if the available information indicates that:

1)the hatchery population in question is of a different genetic lineage than the listed natural populations,

2)artificial propagation has produced appreciable changes in the hatchery population in characteristics that are believed to have a genetic basis, or

3)there is substantial uncertainty about the relationship between existing hatchery fish and the natural population.

58 Fed.Reg. 17,575.

tial proportion of the genetic diversity remaining in the species." *Id.*

On July 25, 1995, NMFS completed a status review of west coast coho salmon and issued a proposed rule to list six ESU's of coho salmon as threatened. 63 Fed.Reg. at 42,587–88. One of the ESU's proposed as "threatened" by NMFS was the "Oregon Coast ESU." NMFS subsequently revoked this decision based partly on conservation measures in the Oregon Coastal Salmon Restoration Initiative and a Memorandum of Agreement between the NMFS and the State of Oregon that assured state protection of this species. 62 Fed.Reg. 24,588 (May 6, 1997). However, a lawsuit was filed in this district that challenged NMFS' decision not to list Oregon Coast coho as threatened. *See Oregon Natural Resources Council v. Daley,* 6 F.Supp.2d 1139 (D.Or.1998) (Stewart, J.) The court ultimately found that NMFS should not have considered the conservation measures in the state restoration initiative and the memorandum agreement with the state of Oregon and remanded to the agency to reconsider its decision. *Id.* at 1161.

Pursuant to court order, on August 10, 1998, NMFS issued a final rule listing the Oregon Coast coho ESU as threatened. 63 Fed.Reg. 42,587 (Aug. 10, 1998). However, within this ESU, NMFS only listed all "naturally spawned" coho inhabiting streams between Cape Blanco and the Columbia River. *Id.* In reaching this listing decision, NMFS applied its April 5, 1993 Hatchery Policy to the coho salmon. 63 Fed.Reg. 42,589. NMFS concluded that nine Oregon hatchery populations were part of the same Oregon Coast ESU as the natural populations. However, the hatchery populations were not included in the listing decision because the hatchery populations were not "deemed 'essential' to recovery." *Id.* Although excluded from the listing decision, NMFS stated that it might

consider using these hatchery populations for future recovery but that "in this context, an 'essential' hatchery population is one that is vital for full incorporation into recovery efforts." *Id.*

Plaintiffs seek to invalidate the August 10, 1998 listing decision. Plaintiffs central argument is that NMFS' distinction between "naturally spawned" and "hatchery spawned" coho salmon is arbitrary and capricious and thus unlawful under the Administrative Procedures Act ("APA") 5 U.S.C. § 706.

## II. *Standards*

██ An agency's actions pursuant to the ESA are reviewed under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). *See Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 980–81 (9th Cir.1985). The APA requires this court to conduct a "thorough, probing, in-depth review" of the agency decision. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). However, this court must also give the agency decision a high level of deference by presuming the agency's action to be valid. *See Ethyl Corp. v. Environmental Protection Agency,* 541 F.2d 1, 34 (D.C.Cir.), *cert. den.,* 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976).

██ An agency's decision is invalid, and summary judgment is appropriate, only if it is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Oregon Natural Resources Council v. Daley,* 6 F.Supp.2d 1139, 1145 (D.Or.1998). An agency's decision is arbitrary and capricious if it:

has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the

evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*O'Keeffe's Inc. v. U.S. Consumer Prod. Safety Comm'n,* 92 F.3d 940, 942 (9th Cir. 1996) (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

 "When a plaintiff challenges a final agency action, judicial review normally is limited to the administrative record in existence at the time of the agency's decision." *Friends of the Clearwater v. Dombeck,* 222 F.3d 552, 560 (9th Cir.2000) (internal citations omitted). Therefore, the agency is only required to "justify its final action by reference to the reasons it considered at the time it acted." *Id.* However, the Ninth Circuit has allowed judicial review of final agency decisions beyond the record under the following four circumstances:

(1) if necessary to determine "whether the agency has considered all relevant factors and has explained its decision;"

(2) "when the agency has relied on documents not in the record;"

(3) "when supplementing the record is necessary to explain technical terms or complex subject matter."

(4) "when plaintiffs make a showing of agency bad faith."

*Southwest Center for Biological Diversity v. United States Forest Service,* 100 F.3d 1443, 1450 (9th Cir.1996) (internal citations omitted). Although both parties submitted affidavits in support of their respective motions for summary judgment, several of those affidavits relied on material outside of the administrative record. The court declines to consider this information.[3]

### III. Discussion

Both parties move for summary judgment on plaintiffs' claims. Defendants further move for summary judgment on statute of limitations grounds.

### A. Statute Of Limitations

 Defendants correctly note that the ESA contains no express statute of limitations. Therefore, the applicable statute of limitations is found at 28 U.S.C. § 2401(a), the general statute of limitations for civil actions against the federal government. *See, e.g., Broadened Horizons Riverkeepers v. United States Army Corps of Engineers,* 8 F.Supp.2d 730, 736 n. 9 (E.D.Tenn.1998); *Kentucky Heartwood, Inc. v. Worthington,* 20 F.Supp.2d 1076, 1092–93 (E.D.Ky.1998); *Strahan v. Linnon,* 967 F.Supp. 581, 607 (D.Mass. 1997).

 28 U.S.C. § 2401(a) provides that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." Under section 2401(a), a cause of action first accrues when the "person challenging the action can institute and maintain a suit in court." *Trafalgar Capital Assoc. v. Cuomo,* 159 F.3d 21, 34 (1st Cir.1998).

Plaintiffs first filed this case in November of 1999. Defendants argue that plain-

---

**3.** For example, Oregon Trout, a non-profit organization, submitted an amicus curiae brief ("Amicus Brief") to the court on behalf of defendants. Oregon Trout opposes the extension of ESA protection to hatchery fish because "to do so would effectively undermine the protection that the [ESA] affords to remaining wild populations." (Amicus Brief at 1.) The court will consider the Amicus Brief to the extent that it assists the court in understanding the administrative record as it existed at the time of the disputed listing. However, the Amicus Brief relies, in part, on material not before the agency prior to its final decision and therefore is not appropriately considered by this court.

tiffs' challenges to the ESU Policy, adopted in 1991, and the Hatchery Policy, adopted in April of 1993, are time barred by section 2401(a) because they exceed the applicable six-year statute of limitations. However, plaintiffs' first cause of action under the ESA challenges the NMFS decision to list only naturally spawned populations of coho salmon as threatened. (Plt.s' First Am. Compl. ¶¶ 42–43.) The final agency decision that promulgated this rule was issued on August 10, 1998. Similarly, plaintiffs' second cause of action challenges the above referenced listing as violating the APA. *Id.* at ¶¶ 57–66.

Any challenge to the earlier NMFS policies would have been premature because they only provided an outline of what the government *could* do in the future with any Pacific salmon population. The earlier policies did not provide a final agency decision regarding specific salmon in specific geographic regions. Also, the earlier policies were not binding on the NMFS and therefore could not provide the basis of the current suit. *See Sierra Club v. Slater,* 120 F.3d 623, 631 (6th Cir.1997) (holding that under the APA the cause of action accrues at the time of final agency action). It was appropriate for plaintiffs to await defendants' *final* listing decision of August 10, 1998, before bringing suit. This presents a justiciable issue for the court and does not run afoul of the statute of limitations. Defendants' motion for summary judgment on statute of limitations grounds is denied.

### B. *The ESA Challenge*

■ Plaintiffs argue that the distinction between hatchery spawned and naturally spawned coho is untenable under the ESA because the ESA does not allow the Secretary to make listing distinctions below that

of species, subspecies or a distinct population segment of a species. Essentially, plaintiffs argue that the Secretary, in this instance, must include or exclude all members of a distinct population segment, as opposed to only some members of a distinct population segment. Defendants argue that the distinction between hatchery coho and natural coho is valid because the NMFS interpretation of the ESA, and in particular its interpretation of a "distinct population segment," should be afforded great deference by this court.

After reviewing the administrative record and the relevant statutes and legislative history, the court finds that the NMFS August 10, 1998 listing decision is arbitrary and capricious and therefore invalid because it relied on factors upon which Congress did not intend the NMFS to rely. The NMFS decision defines the ESU and thus DSP, but then takes an additional step, beyond its definition of an ESU, to eliminate hatchery coho from its listing decision.

NMFS defined a "distinct population segment" by making it the equivalent of a term (it created) called an "evolutionary significant unit" ("ESU").[4] A species is considered an ESU, and hence a DPS, if it is "substantially reproductively isolated from other conspecific population units" and "represent[s] an important component in the evolutionary legacy of the species." 56 Fed.Reg. at 58,618.

■ The NMFS interpretation of what constitutes a "distinct population segment" is a permissible agency construction of the ESA. *See PanAmSat Corp. v. Federal Communications Comm'n,* 198 F.3d 890, 894 (D.C.Cir.1999) (citing *Chevron U.S.A., Inc. v. NRDC,* 467 U.S. 837, 842–43, 104

---

4. 56 Fed.Reg. 58,612 states "a salmon stock will be considered a distinct population, and hence a 'species' under the ESA, if it represents an evolutionary significant unit (ESU) of the biological species."

S.Ct. 2778, 81 L.Ed.2d 694 (1984) (court must defer to a permissible agency construction of a statute). Specifically, the NMFS creation of an ESU and the factors used to define it, geography and genetics, are within permissible limits under the ESA.[5]

The central problem with the NMFS listing decision of August 10, 1998, is that it makes improper distinctions, below that of a DPS, by excluding hatchery coho populations from listing protection even though they are determined to be part of the same DPS as natural coho populations.

■ The ESA "specifically states in the definition of 'species' that a 'species' may include any subspecies .... and any distinct population segment (DPS) of any species ... which interbreeds when mature." 16 U.S.C. § 1532(16); *Southwest Center for Biological Diversity v. Babbitt,* 980 F.Supp. 1080, 1085 (D.Ariz.1997). Listing distinctions below that of subspecies or a DPS of a species are not allowed under the ESA. *Southwest Center,* 980 F.Supp. at 1085. Yet, this is precisely what the NMFS did in its final listing decision of August 10, 1998. NMFS concluded that nine hatchery stocks were part of the same Oregon Coast ESU/DPS as the "natural" populations but none of the hatchery stocks were included in the listing decision because NMFS did not consid-

er them "essential for recovery." 63 Fed. Reg. 42,589.

The distinction between members of the same ESU/DPS is arbitrary and capricious because NMFS may consider listing only an *entire* species, subspecies or distinct population segment ("DPS") of any species. 16 U.S.C. § 1532(16). Once NMFS determined that hatchery spawned coho and naturally spawned coho were part of the same DPS/ESU, the listing decision should have been made without further distinctions between members of the same DPS/ESU.

The NMFS listing decision could arguably be proper under the ESA if the NMFS had defined "hatchery spawned" coho as a separate DPS, but it does not appear that this is possible. To classify hatchery spawned coho as a DPS under NMFS's own standard, hatchery spawned coho would have to be 1) "substantially reproductively isolated from other conspecific population units," and 2) "represent an important component in the evolutionary legacy of the species." 56 Fed.Reg. at 58,618. Here, hatchery spawned coho are likely not "substantially reproductively isolated" from naturally spawned coho because, once released from the hatchery, it is undisputed that "hatchery spawned" coho and "naturally spawned" coho within the Oregon Coast ESU share the same

---

5. Congress did not prohibit genetics from being considered during the listing process and specifically included language in the ESA that allows agencies to differentiate its listings among the same species based, in part, on the degree of threat that species face in different geographical regions. For example, Congress linked the degree of threat a species faced with its geographic location by defining "endangered" or "threatened" under the ESA, as a degree of harm experienced "throughout all or a significant part of its range ...." 16 U.S.C. § 1532(6),(20). Additionally, Congress adopted the DPS language stating:

> The committee agrees that there may be instances in which [the Fish and Wildlife Service] should provide for different levels of protection for populations of the same species. For instance, the U.S. population of an animal should not necessarily be permitted to become extinct simply because the animal is more abundant elsewhere in the world. Similarly, listing populations may be necessary when the preponderance of evidence indicates that a species faces a widespread threat, but conclusive data is available with regard to only certain populations.

S. Rep. No. 96–151.

rivers, habitat and seasonal runs. (Plt.s' Stmt. of Mat. Facts at ¶ 2; Dft.s' Resp. to Plt.s' Stmt. of Mat. Facts at ¶ 2.) It is undisputed that "hatchery spawned" coho may account for as much as 87% of the naturally spawning coho in the Oregon coast ESU. (AR Ex. 12 at 120.) In addition, hatchery spawned and natural coho are the same species (Dft.s' Resp. to Plt.s' Stmt. of Mat. Facts at ¶ 1.), and interbreed when mature (*Id.* at ¶ 4). Finally, the NMFS considers progeny of hatchery fish that are born in the wild as "naturally spawned" coho that deserve listing protection.

Despite these facts, NMFS decided that hatchery coho, that are part of the same DPS/ESU as natural coho, should not be listed because they were not "essential" to recovery. Thus, the NMFS listing decision creates the unusual circumstance of two genetically identical coho salmon swimming side-by-side in the same stream, but only one receives ESA protection while the other does not. The distinction is arbitrary.

Finally, NMFS argues that its listing decision does not contradict the terms of the ESA because the listing decision, and relevant polices, are in accordance with ESA goals that prioritize "natural" salmon populations and "genetic diversity" within those populations. Although I agree with the general concept that "genetic diversity" is one factor in the long term success of a threatened species, and thus is one of many underlying goals of the ESA, genetics cannot, by itself, justify a listing distinction that runs contrary to the definition of a DPS.

The term "distinct population segment" was amended in the ESA in 1978 so that it "would exclude taxonomic [biological] categories below subspecies [smaller taxa]

from the definition." [6] H.R. Conf. Rep. No. 95–1804, at 17 (1978), *reprinted in* 1978 U.S.C.C.A.N. 9485, 14855.

Congress adopted the DPS language stating:

> The committee agrees that there may be instances in which [the Fish and Wildlife Service] should provide for different levels of protection for populations of the same species. For instance, the U.S. population of an animal should not necessarily be permitted to become extinct simply because the animal is more abundant elsewhere in the world. Similarly, listing populations may be necessary when the preponderance of evidence indicates that a species faces a widespread threat, but conclusive data is available with regard to only certain populations.

S.Rep. No. 96–151.

Thus, Congress expressly limited the Secretary's ability to make listing distinctions among species below that of subspecies or a DPS of a species. Here, the NMFS listing decision was based on distinctions below that of subspecies or distinct population segment of a species.

Therefore, the NMFS's listing decision is arbitrary and capricious, because the Oregon Coast ESU includes both "hatchery spawned" and "naturally spawned" coho salmon, but the agency's listing decision arbitrarily excludes "hatchery spawned" coho. Consequently, the listing decision is unlawful. 5 U.S.C. § 706(2)(A).

## IV. *Conclusion*

For the foregoing reasons, plaintiffs' motion (# 74) for summary judgment is granted. Defendants' cross-motion (# 81) for summary judgment is denied. The August 10, 1998 NMFS listing decision, contained at 63 Fed.Reg. 42,587, is de-

---

**6.** The original definition of species was "any subspecies of fish or wildlife of the same species or smaller taxa in common spatial arrangement that interbreed when mature."

clared unlawful and set aside as arbitrary and capricious. The matter is remanded to the NMFS for further consideration consistent with this opinion. The agency is further directed to consider the best available scientific information, including the most recent data, in any further listing decision concerning the Oregon coast coho salmon.

IT IS SO ORDERED.